STEWART & STEWART v. DUGIN.

1. It is not fraud for a person to sell unsound property, knowing it to be unsound. But it seems that if the purchaser did not know of the unsoundness, and the seller concealed it, it would amount to fraud.

2. If the purchaser asks relief, because of a slave being deceased when sold, and his subsequent death,—it should appear in evidence, that the disease of which he died, was that which he had at the time of sale, and that the purchaser did not know at the time of purchase, of his unsoundness.

APPEAL from the circuit court of Franklin county in chancery.

Opinion of the court delivered by McGirk J.

The appellants brought a bill in chancery in which they state, that in Oct. 1834, Dugin sold to W. Stewart a negro boy a slave, named Bill, for the sum of five hundred dollars, and that William Stewart the purchaser, gave his bond for the payment of the money, with W. R. Stewart his security, that Dugin has brought suit on the bond and recovered judgment, and is about to enforce the payment by execution. The bill states, and charges that Dugin at and before the sale of the slave to Stewart, represented him to be healthy and sound, which induced him to buy. The bill then charges that when Stewart bought the slave he was unhealthy and unsound, and that the slave so continued unwell of the disease aforesaid, till some time in February 1835, when he died of the disease. The bill farther states that shortly after Stewart discovered the negro was unsound he offered to return him to Dugin, who refused to receive him;—the bill farther charges that the negro was constitutionally unsound from his boyhood, was diseased in his lungs, and subject to fits, and in fact was worth nothing when sold by Dugin, all which Dugin knew, and concealed from Stewart. The bill prays a discovery, and that the judgment may be perpetually enjoined. The circuit court granted an injunction. Dugin, the defendant, put in his answer;—he admits that he sold the negro in question to Stewart for the sum mentioned, and that he is prosecuting suits on the bonds &c. He denies that at the purchase and sale of the negro he represented him to be either healthy or sound, and he declares no enquiry was made by Stewart on that subject—but that Stewart came to him and solicited the purchase. He alleges also, that Stewart lived in the neighborhood and had known the negro for a long time. The answer also denies that Stewart ever offered to return the negro to him,—except, that some time in the

month of January 1835, Stewart came to Dugin's house but did not bring the slave with him; and he denies that Stewart did then, or at any other time, tender the slave to him, he says the slave came to his house by himself, in the night of the day Stewart came to his house as aforesaid. The answer denies that the respondent ever warranted the slave to be sound. The answer admits that at the house of Inge, Stewart requested him, the respondent, to take the slave and take care of him in his sickness, which he refused to do. The answer admits the negro is dead, but insists that he did not die of any disease he had on him at the time the respondent sold him, but says he was then sound, and denies all misrepresentation,—says the negro had no constitutional disease when sold &c.

The complainants file a general replication. The cause was heard on the bill, answer and evidence, and the court decreed that as to one hundred dollars, the injunction is made-perpetual, and as to the other four hundred it is dissolved; the court also decreed the costs against Stewarts. The substance of the evidence given at the trial on the part of the Stewarts appears to be: that, one Partney owned the negro when a boy, that he bought him of some one in St. Louis, when Bill was about 15 years of age, that before he bought him he knew he had fits, and the boy had several after he bought him, that about three years after he bought, the fits ceased, he never put the boy to hard work. In 1818, he sold the boy to Dugin, and then supposed he was able for hard work,—owned Bill eight or nine years. It was proved by other witnesses that Bill had two or three fits after Dugin bought him, at intervals; but there is no testimony to show any of these fits took place near the time when Dugin sold,—some witnesses say, at times the slave appeared sickly, none of them pretend to know any thing about the nature of the disease;. a certain Doctor testified that the disease which the boy had on him when he saw him, was of a chronic nature, he says, some two months after Stewart bought him, he thought the disease incurable. There was also testimony, that after Stewart owned the negro and shortly before his death, he was seen to fall from his horse, the witnes helped him on, he fell off again, appeared to be stiff and helpless. A witness testified that he had known the negro some eight or ten years, had worked with him in mineing while Dugin owned him, found him to be a good hand, also knew, that some three or four years before Dugin sold the negro, he

OCT. TERM
1835.

Stewart & Stewart
v.
Dugin.

was sick for a spell, knows not what was the nature of his sicknes, that he was then well. Bill about August or July 1834, was sick for about a month, seemed to be well again. Another witness, who was the step daughter of Dugin, said she knew Bill ever since Dugin bought him, and only knew him to be sick as above stated by the preceding witness, says also, that after Stewart bought Bill he came to Dugin's house sometime in January 1835, said he was then on his way to sell Bill, said that he had before that given Bill a pass to hunt a master,—that he, Bill, had swam the Merrimack river, it appeared to hurt him, that he had given Bill the pass to hunt a master, he had overstaid his time, burnt off his shoes, come home barefooted. Three issues were made up and found by the jury. The first is, that at the time of the sale, the slave was unsound; the jury find this in the affirmative. The second is, that Dugin knew him to be unsound; this is found in the affirmative also. The third issue tendered is, that at the time of the sale, the slave was worth nothing; the jury find he was worth something. There was a good deal of other testimony, more in detail than can well be set down here; it is believed however, that it need not be further gone into. It is assigned for error that the court erred in not making the injunction perpetual as to the whole amount. Messrs. Bowlin and Mayfield of counsel for the appellants insist on four points to reverse the decree. The 1st is, that the contract is void for the fraud existing, and proved in this case. 2nd, the court erred in receiving the verdict, which as it now stands, means nothing. 3rd, the court erred in entering up the decree, when the finding was decidedly in favor of the complainants. 4th, the court erred in fixing the value of the slave when none had been fixed by the jury after that question had been referred to them, and they had failed

It is not fraud for a person to sell unsound property knowing it to be unsound. But it seems, that if the purchaser did not know of the unsoundness, and the seller concealed it, it would amount to fraud.

to fix the value of the same. It is believed that all these points may be resolved into the first point made, which is, that the contract of sale is void by reason of the fraud proved to exist in the transaction. The first question to be considered is, whether the proof makes out any fraud on the part of Dugin. The jury have found that at the time of the sale, the negro was unsound, and that Dugin knew it. Is it a fraud for a man to sell unsound property knowing it to be so? We have seen no case where it has been decided to be fraud;—if there is any concealment on the part of the vender, then such concealment might amount to a fraud. In this case if Stewart did not know of the fact of unsoundness, and it was not visible to the

OCT. TERM
1835.

Stewart & Stewart
v.
Dugin.

eye, then he was imposed on. There is no proof that Stewart did not know all about the condition of the slave, he had long been acquainted with the slave. But setting this matter altogether aside, there is no evidence to show what was the nature of the unsoundness under which the slave labored when sold. When the Doctor inspected him two months afterwards, he declared him to labor under a chronic disease, that is, a disease of long standing. But whether the disease was visible or not, whether of a dangerous character or not, does not appear; the degree of the disease should have been shown to enable this court to judge whether it was of such a nature as to render the contract void. A witness in the cause has testified that Stewart said before the death of the slave, that Doctor Prichett declared the disease of which the negro was afflicted was the dropsy. If this were so, Stewart must have seen the symptoms when he purchased. We know this disease is generally known by symptoms, not easily concealed, if one were even desirous to conceal the same. Furthermore, there is no sort of testimony that this negro died of any disease he had on him when sold. But on the contrary, the evidence strongly tends to show that the negro died of some disease either contracted after he was the property of Stewart, or excited and provoked, if existing before, by exposure. He swam a river in the depth of winter, he came home after being absent to hunt a master, in the middle of the winter season barefooted; these things might suddenly disorder a well man so that he would speedily die,—and indeed we find that shortly after this, Bill was found sick on the road side and died in a day or two. There is no sufficient evidence that Dugin practised any fraud whatever on Stewart, in concealing the health of the negro. There is no evidence showing that Stewart did not know when he made the purchase what was the true condition of the slave. If he had desired a warranty of soundness, he could have asked for it; he did not ask it, and none was proved;—unless these things were proved, we think no question of law can well arise in the case. The circuit court seemed to be of opinion that Dugin was only entitled to four hundred dollars, instead of $500, and perpetually enjoined one hundred. This according to the evidence was perhaps the true measure of equity between the parties; at all events we cannot say it is not. The point arising out of the defect of proof being decided for the appellee, it is unnecessary to decide the other three points made by the appellants. The decree is affirmed with costs.

If the purchaser asks relief because of a slave being diseased when sold, and his subsequent death, it should appear in evidence, that the disease of which he died, was that which he had at the time of sale, and that the purchaser did not know at the time of purchase, of his unsoundness.